I'd be happy to answer any questions the Court has about any of the issues in our brief, but I intend to focus my time on point one, the competency issue, and if a few minutes remain at the end, I'd like to touch on the continuance issue point two as well. Turning to competency, the Supreme Court has recognized that because competency to stand trial is so fundamental, due process forbids procedures that create a significant risk of an erroneous determination that the defendant is competent. And Congress designed the Insanity Defense Reform Act, the IDRA, to effectuate this unwaivable due process protection by ensuring that in any case where a district court finds reasonable cause to believe the defendant may be incompetent, that there will be a reliable, evidence-based, judicially independent determination of competency. As the government repeatedly reminded the district court below, the IDRA does this by laying out— Do you say that's required in every case regardless? Yes, Your Honor, where reasonable cause is found. Once reasonable cause is found, it's sort of the critical point in the competency process. Before that, the Court has broad discretion to consider all the facts before it and decide whether there's reasonable cause, and in the vast majority of cases, there won't be. But in those very small minority of cases where a court says there is reasonable cause to believe the defendant may be incompetent, at that point, a series of procedures are called for. When was the issue of competency brought to the attention of the district court? Well, Your Honor, the district court actually first raised the issue of competency on its own. I think it was— No, no, but answer my question. When was it brought to the—when was the question of competency brought to the district court? At what point? Well, Your Honor, the defense filed a motion on the Thursday—it was Thursday night after the government arrested at the guilt phase saying that Mr. Counsel was incompetent and saying the court should find reasonable cause, and they laid out information— But normally, these competency matters are resolved prior to trial, not in the middle of the trial. Now, did you raise the competency issue prior to trial? Well, Your Honor, they often arise actually during trial because mentally ill defendants often decompensate during trial, and the Supreme Court has said specifically in DROP and numerous courts, including this court, have warned district courts that even when it arises during trial, the court still needs to engage in— Your Honor, I think that the fact that it's raised in the middle of trial certainly is a consideration, but as we pointed out in our brief, it often happens—there are numerous capital cases, including the Roof case in this—that came out of this same district, also a capital case, where a competency issue arose prior to trial. Between the end of the guilt phase and the beginning of the penalty phase at very similar timing, and the court had—went through the process. It had an independent expert come in, do multiple interviews with Roof, look at collateral sources, write a detailed 22-page report, and there was a hearing with multiple people testifying, which took a week, which was what would have been required here. The court—district court here had already contacted two independent experts who were prepared— Your Honor, I think that it's required by due process, but also by the IDRA. The IDRA lays out a series of steps in order to achieve a reliable, evidence-based, independent judicial determination. In statute 4241A, the court shall grant the motion if there's reasonable cause to believe the defendant may presently be suffering from a mental disease, and it says that that hearing will be conducted under 4247D. And that provides that the person shall be afforded an opportunity to testify, which he was, to present evidence, which he did, to subpoena witnesses, which he could have if he wanted to, and to confront any witnesses who appear at the hearing and be appointed by counsel. He got all that. Well, Your Honor, I think what—that's all true, but I think what it leaves out, the other piece of the equation, which is that the court has an independent sua sponte duty when it comes to competency. Competency is a unique issue. With most issues, once the defense counsel acquiesces to something, it's end of ballgame, and we wouldn't be here. What's your best case that says there's this non-delegable, mandatory duty to appoint the examiner on a circumstance like this? Your Honor, I think you're talking about under the IDRA that the judge has to commence the process or appoint an independent examiner? He has to commence the process. I've already read to you what the statute requires. You're saying it requires something in addition to that. So what I'm asking you for is what's your best case that supports that view? Your Honor, I think we've never had a case where a court has short-circuited the process like this. Why did you say short-circuited it? Because the court's read to you what the statute requires. You don't disagree. He got everything the statute requires. How does that amount to a short circuit? Well, Your Honor, I think in other cases, beginning with Pate, the Supreme Court's decision in Pate, and we've cited numerous cases where defense attorneys say, I'm not challenging competency or I think the defendant is competent, and the court still goes through the steps and is told when it doesn't, it should have gone through the steps. As far as the IDRA, it does say may, court may order an evaluation and a report. It doesn't just say may, it says shall, and then it shifts to may. The same statute contains the word shall, and we agree that the shall thing was done, and then the statute switches from shall to may, which I think may alone, why isn't that a real problem? I don't think it's a problem for this reason, Your Honor. We're not denying may means may. Certainly, a court has some discretion in certain situations where it finds reasonable cause not to order an evaluation and a report. Well, okay, but that seems like a pretty important concession because, I mean, I understand there are cases where the Supreme Court says even though counsel's not asking, but just putting myself in the shoes of the district court here, it's not just that defense counsel wasn't asking. It was defense counsel was saying, please don't. Please don't appoint an independent person. We don't want to turn this over to the government. We don't want the government to get their hands on what the evaluator might find out. I mean, why doesn't that put the district court in just a really tough position with defense counsel saying, do not do this thing? I mean, then they're facing an IAC claim or some other. I mean, if I was a district court judge, I would be very reluctant to order something that defense counsel is actively opposing. Well, I think a couple of reasons, Your Honor. First of all, the court has that independent duty and the cases say that. But I think specifically here, the fact that defense counsel was coming in and saying what it said really not only should it not have carried much weight, but I think it should have set off some alarm bells for the court because this is a defendant just to set the timeline. This is Thursday and Friday at the end of the guilt phase. The defendant has, by all accounts, a delusional breakdown. And defense counsel meets with him for twice Thursday night after the government rests. They meet with him in the marshal's lockup. Then they meet with him for an hour and a half in the jail. They file this competency motion where they describe how he's had this breakdown, how he's not, doesn't have a rational understanding. He's not rationally communicating. They believe he's incompetent. They come in Friday. They detail this further. They give the court a great deal of information ex parte. They talk about how Mr. Counsel believes he's being persecuted because he can't subpoena God. And the court then interacts with Mr. Counsel on its own on Friday and sees this and finds reasonable cause. At that point, defense counsel, from the time they file the motion, they are clearly, as Your Honor mentioned, they are concerned with avoiding an independent expert that is going to have any sort of disclosure to the government because they fear that this is going to then get used at the sentencing hearing. So they're saying to the judge. Seems like a totally reasonable fear to me. 11-line statement, which they don't come in and say, Judge, you know, that delusional breakdown, he was malingering. We were mistaken. Or, Judge, what more do you what more do you what more do you want? I mean, this whole proceeding has been marked by continuing, you know, continuing requests for continuances, delays in filing briefs and everything. The whole strategy seems to be to string everything out indefinitely. And it's not surprising that the district court would say, look, we've got a trial. It's an ongoing trial. I don't want to interrupt the flow of the trial. I don't want to get proceedings off track. And blur the jury's focus. This was, it seems to me, a trial judge has a duty, particularly when an issue is raised right in the middle of trial, to keep the trial on track and to keep the jury's focus clear and not to disrupt the whole rhythm of things. And as I say, from the very beginning in this case, there have been all these requests for continuances and for extensions and this and that. And the district court says, I'm going to try to do this. I'm going to do what's required of me, but I'm going to do it in an efficient manner. And I don't see what's wrong with that. Your Honor, I think what the district court actually said is it didn't need to go through the process because when it had this, what the government calls a competency hearing, which is Monday morning, they come in and defense counsel hands the bare bones statement to the court and says, we believe he's competent. And the court says, based on what's been presented, I'm finding him competent. The court didn't consider anything other than that statement. At minimum, the court would need to consider other things in the record. And the government claims the court considered its own observations after the delusional breakdown and counsel's observations. But that's not accurate. The court had no opportunity to make any observations. It dismissed on Friday right after its interaction with Mr. Counsel. And then the next time court opens is Monday morning and the court's declaring him competent. There's nothing in the record that defense counsel had any observations of him or presented those to the court. And the court specifically says at that Monday conference, and again, in a post-trial order, I didn't need to go through the independent expert and the process because defense counsel said he was competent and they handed me this statement. I think they had two independent experts who were ready to complete this process in about a week. The trial was already running far ahead of schedule. And this is what other courts have done in this situation. This is a capital case where there was a serious question, where there was reasonable cause that the defendant was not competent and to rely on this bare bones statement. It's odd to me, again, that the problems are as deep seated as you say they were. Why they did not manifest themselves prior to trial. It's just odd that all of a sudden these competency issues would raise themselves for the first time in the middle of a trial. Because people that exhibit this kind of behavior, they don't just decompose in the middle of a trial. There are signs and manifestations of it all along the way. And the district court, I think, was entitled to say, you know, there's a real timeliness question here, but nonetheless, I'm going to convene this hearing and we're going to hear from the relevant parties involved. What's wrong with that? And the court brought this up. And again, defense counsel didn't say, there's nothing wrong with this guy. They said, judge, we won't put that in our vouchers anymore. And we're concerned about disclosure to the government and that they're going to use this for sentencing. So they put a lid on things. The court saw and heard from Mr. Counsel what the defense wanted them to hear. Then there's also, fast forward a few months, and there's a defense expert, this is a continuance motion, who had a preliminary or tentative diagnosis of Mr. Counsel as bipolar, which is a major mental illness that's characterized often by delusions of the kind that Mr. Counsel manifested during trial. And the expert said, there needs to be testing and there needs to be reinterviewing to rule this out. Then when you get to the delusional breakdown, it's true. One of the attorneys says, judge, my experience with him before this was that he was competent. But the other attorney is a little bit more equivocal. He's saying, judge, this is the first time we've had a complete breakdown. Says, judge, I'm walking on eggshells. I don't know how much I can say in front of the client. So this was not the first time this had appeared. And there were signs of mental illness. And again, as this court and other courts have recognized, mental illness, someone who's mentally ill can decompensate and become incompetent during a trial. And that's why courts have to be on the lookout for this. I want to talk a little bit in response to Judge Hyten's question about the statement and why under the circumstances here it was so problematic. So defense counsel comes in and everybody is acting like... It's a psychologist statement you're talking about. Yes, your honor. The elephant in the room is this delusional breakdown. And no one's mentioning it. Defense counsel doesn't mention it. They don't say it wasn't really a delusional breakdown. We misunderstood. We've had more observations. And if you look at the statement, it raises more suspicions and questions than it answers. First of all, it doesn't look like any competency report I've ever seen or I suspect the court's ever seen. And again, I'm not just talking about the pretrial. Judge Wilkinson talked about it. It is often raised at pretrial and people go to Butner and they get a thorough report. But even when it's raised mid-trial, I've never seen a competency report that didn't say here are all the things we looked at and here are all our findings. So what is this statement says? It says based on a three-hour interview. It doesn't say they had anything else. Did they know about the bipolar tentative diagnosis? Did they know about the demons? Did they even know about the delusional breakdown? Well, it is a statement signed by a physician and a Ph.D. psychologist. And they state, and I don't think this is equivocal, we believe to a reasonable degree of medical certainty that Michael Counsel, a Grandin counsel, is competent to stand trial. He's able to understand the nature and consequences of proceeding against him to assist in his defense if he chooses to do so. Now, then they warn the court things may change in the future. But at least as far as that statement goes, there's no equivocation about competency. Your Honor, I think there is equivocation in the statement. And if you look at it closely and I just did. I just read it to you. Well, let me let me suggest why. First of all, they're not talking about the delusional breakdown. OK, they're not talking. One of these experts saw Mr. Counsel the afternoon of the delusional breakdown, not mentioning that they're saying is very they're very carefully bounding this. They're saying as of this date, they're not saying what they knew. They're not saying they looked at the history or symptoms or testing all the things the IDRA says should be done and all the things the government was urging the court to have an independent expert look at. And we also got this was a statement signed by these experts. Defense counsel said they're going to be signing a statement. The case law talks about why you need an independent expert. It's not just a formality where the court points the expert, although it didn't even do that here. It's because the court sets the boundaries of the exam. The court says, here's the scope of your evaluation. You've got to look at all these things. So we have a reliable exam and you've got to have all this information. You've got to know things. You've got to know about the delusional breakdown. You've got to know about the bipolar. You've got to know about the demons. And you've got to give me all your findings. What this reads like is something that that defense counsel wrote very carefully so they could get out from under this whole issue and get it past them. To go back to something, Judge Agee asked you earlier for your best case. Can I ask you a different question? Which is you mentioned the roof case. You mentioned another case from this district. Can you think of a case where the district court did a full-on hearing of the type that you want, where defense counsel was actively opposed to doing it? I think there are numerous. Yeah, I think, well, in the Ernst case. That's not true on the roof, for example, right? In the roof, the defense counsel was standing up saying, don't do this, don't do this. I think there are a couple of cases we cite out of this circuit, the general case where Judge Wilkinson was on the panel and the Ernst case, where they went through the whole process, even though defense counsel was saying the defendant's competent. I would say in response to Judge Agee's question, I think our best case is actually Pate, the Supreme Court case, where there are differences, but in material respects, it's very similar to here. You had a court psychologist who had evaluated the defendant, and there was a written stipulation presented to the court that if he testified, he would say the defendant understood the proceedings and could rationally cooperate with counsel. And the Supreme Court said, given the evidence in the record that raised a reasonable cause to believe the defendant was incompetent, relying on that bare-bones statement was not enough. Was that the defense expert or the government's expert? That was the court's expert. Again, I think the fact it's the defendant's expert, I'm not saying that's irrelevant. But I think under these circumstances where we don't, where there's so many questions about what the experts knew, what they did, and what they reported, and where we know defense counsel's agenda here is to avoid at any cost an independent evaluation, I don't think that provided the sort of reliable determination that was required. How long would it take to have the competency issue, in your view, wrapped up to your satisfaction? How long would it take? Your Honor, do you mean back then or at this point if the court were to remand? No, I'm talking about at the time the district court ruled, at the time in the trial. I think the record makes clear it would have been a week that the court had already contacted two independent experts, and one of them had started working on it, and the other said he could come in and do an evaluation and be ready to testify at a hearing the following Friday. Well, you say a week, that so often these estimates turn out to be shorter than the time actually required. But a district court could certainly think that a week's hiatus right in the middle of a trial, right after the government arrested its case and before, would destroy, would take the trial off track. Most district court judges I know are interested in having a proceeding that's an integral whole and that provides some continuity to the jury's perceptions. You wait a week or two weeks or whatever, and then there are startup costs, and who knows what the jurors recall or remember from the earlier presentation of the government's case. It's much better if the trial can proceed in a way that the jury has just heard the government's case and is now prepared to hear the rebuttal. And this kind of thing brought up at this point in the trial, it is just disruptive in terms of what you hope the trial will produce. I understand, Your Honor, and I guess all I could say is that I think given the gravity and the need, the constitutional and statutory demands for reliability, which were not met here, I think the difference between a day and a week, which other courts have granted would not have been unreasonable. Before I sit down, I do want to answer Judge Agee's question a little bit to go back to the statute and what's required. And Judge Hyten's also asked about the use of the word may, because I think this is very important. The question is not whether the court has some discretion, it does. The question is, what are the bounds of the discretion and what's the extent of the bounds? Now, our main argument is if you look at the legislative history of the IDRA, if you look at precedent, if you look at the logic and structure of the statute, the court does not have to order an IDRA compliant evaluation and report if it already has the equivalent of that that's recent enough. Thank you, Mr. Fisher, because you can take up this in rebuttal because you've reserved some time. Your Honor, if I may just have 30 seconds and take it away from my rebuttal to finish answering the question. Sure. But at minimum, due process says there has to be the judge has to have reliable evidence based independent decision making. And so at minimum, you've got to have that. And here between this bare bones statement, which was it and nothing else, the court did not have that. Thank you, Your Honor. Thank you. All right. Let's hear from Miss Adams whenever you're ready. Thank you, Your Honor. May it please the court, Anne O'Connell Adams for the United States. There are four reasons why the competency hearing in this case was appropriately brief. First, it occurred mid-trial after. Before we get into this, can I just ask you about candidly what I find most troubling maybe in this case? Why did the government object to questions 78 and 79 that asked whether certain races are more prone to violence? I get that some of the questions you objected to, I'm not really sure why we would ask them. I don't see why the government would oppose asking prospective jurors, do you believe members of certain racial groups are more prone to violence? Well, they are, in our view, asking the same thing as the question 18. Can you be fair and impartial in a case involving an African-American defendant and a Caucasian victim? I assume that I don't believe for the moment that those are the same questions. Okay, so I think the criticism that the other side has of those questions, of the questions that were asked about whether a person could be fair in evaluating a case where the defendant is black and the victims are white, is that people won't answer that question honestly. I think the same could be said about the questions that Your Honor is asking about. Do you believe that people of certain racial groups are more predisposed to commit violence? If the idea is a person is not going to answer that question honestly in a questionnaire with respect to the questions that were asked, I don't know why it would be any more likely that a person would answer that question yes when it's asked. And the question here is whether the district court abused its discretion in deciding which questions would be asked. I'm asking why the government objected to those questions. I don't know. I don't know. But they are, in my view, duplicative of the questions that were asked. And additionally, I'll point the court to the Supreme Court's decision in Pena-Rodriguez that says, sometimes questions like this that are a bit aggressive can prime racial biases without actually bringing out any information from the jurors about whether they hold those biases. The district court was required to ask two questions under Turner and Moomin, and it asked those. Those were questions 18 and 19. It gave the jurors information about the race of the defendant and the race of the victims, and it asked if they could be fair and impartial in a case that involved a black defendant and white victims. And it then asked four additional questions of the ones that defense counsel was proposing. So it asked if you or a member of your immediate family has been a member of a club that excludes people based on race. Do you socialize with people of different races? Is there a racial group you feel uncomfortable being around? Sure. I get it. Is it your view, say, under a case like Ham v. South Carolina, the district court asks more questions than it was required to? Yes. The district court is required to ask just the two questions, 18 and 19, and it went beyond that with four additional questions in this case. And those questions did elicit affirmative responses from many of the jurors, which then the counsel was able to ask follow-up questions about during voir dire. And I'll also just point out that any— Counsel, I thought—am I correct? I thought I recalled that both sides were permitted to pose additional questions. That's correct, Your Honor. So the question— And this was a procedure requested by the defense. That's correct. So the questions that were asked in the questionnaires were ones that the parties worked on together and had disagreements. The court decided which ones it would ask in the questionnaires that went to everybody. And then at the actual voir dire proceeding, the counsel for each side had the opportunity to ask additional questions five minutes per side. During voir dire, did they take advantage of that opportunity to pose additional questions? Defense counsel did not, you know, pose these questions, the questions that Judge Heitens is asking about of every juror that was up there. I don't think they, you know, went through a list of the questions that were excluded, but they certainly had that opportunity to ask questions that they wanted asked that were not included in the questionnaires that were provided by the district court. I guess my last question on this topic, does the government routinely object to questions like this, and if so, why? I don't know the answer to that. And I don't think, I think what we're trying to get at here is to find questions that will root out racial biases. I mean, yeah, but the facts of this, I'm just going to say I don't think the district court probably abused its discretion under our precedent, but I am deeply troubled by the government objecting to these questions. This is a case in which a black defendant is accused of murdering two white people in a violent bank robbery. I don't understand why the government objects to asking prospective jurors, do you think certain racial groups are more prone to violence? Well, in the context of this case, the defense proposed 25 different questions on racial bias. The parties agreed to a few of them. The district court included several more. And I don't know if it's the government, I don't think this is probably proposed in every case, so I don't know if the government would have a practice of objecting to it in every case. But, again, as you point out, the question here is whether the district court abused its discretion, and I don't think it could have given the questions it asked and defense counsel's opportunity to ask further questions at the individual court here. On competency, the competency hearing occurred mid-trial after defense counsel had indicated multiple times that they had no concerns about competency. Second, defense counsel's concerns were based on some isolated comments that defendant made after the prosecution arrested, that he now wanted to testify, and that he shot the victims but didn't kill them because God decides who lives and dies. And defense needed a brief time to figure out and understand what he meant by those comments. Third, there was no history of competency concerns with this defendant. The district court asked about competency early on out of an abundance of caution, it said in its order, and hadn't personally observed anything about the defendant that gave rise to a concern. But defense counsel assured the court all along that this defendant was competent. And fourth, the defense examined counsel's mental health during its mitigation investigation. But the defense never even presented mental health evidence as mitigation, much less raised a serious concern that counsel was unable to understand the proceedings or assist his lawyers. So under the circumstances, accepting the short statement submitted by Drs. Hilke and Maddox was appropriate, rather than requiring them to submit a full report to test a competency claim that the defense had raised, but that nobody wanted to press on Monday morning. So the defense raises the eighth case, I believe, as its most analogous case to the mental hearing question that we have here. Why don't you give us your view of why that case, I assume you would say, is not applicable. So why don't you tell us why? The difference with Pate v. Robinson, the trial court there had failed to conduct a competency hearing in the face of four defense witnesses that were expressing the opinion that Robinson was insane. And there was uncontradicted testimony of his irrational behavior. The court, you know, had this affidavit or this thing from its experts saying, if called to testify, I will testify that he's competent. But you had a lot of other evidence in the record there. Here, the evidence of counsel's competency is extremely, extremely thin. The court pointed a year before the trial to the FBI interview. And, you know, the court said, are you sure, are you going to raise a competency issue in this case? I want to figure that out now, if you are, so that it doesn't come up at the last minute. And defense counsel said, no. The court said, the things that I'm looking at in the record are, when he was interviewed, he said he was desperate and he needed money when he committed the crime. He didn't deserve to live. Those are not statements that indicate that somebody is incompetent. And there's a reference to demons in that police interview, the reference to demons controlling people's minds. But what counsel said after he said, there's lots of demons out there, he said, the demons don't control my mind. I willingly went with the demons and understood what I was doing. And so none of the, that is what the judge observed pretrial. And then when this came up after the prosecution rested, the evidence that the defense counsel was pointing to was counsel's change in heart about whether he wanted to testify. And also these statements that he didn't kill the women, he pulled the trigger and shot them, but it's God decides who lives or dies. And so defense counsel needed time to figure out what those statements meant. I would presume that that's what the experts talked to him about when they met with him over the weekend. And then defense counsel points out there was also a psychiatrist that had evaluated counsel in the mitigation case and said he may have bipolar disorder and that should be looked into. That was included in the record as part of the request for more time to delay the trial. I'll just point out a diagnosis of bipolar disorder doesn't mean that somebody is incompetent. The standard for incompetency is whether the person lacks a rational and factual understanding of the proceedings against them and whether they have the ability to assist counsel in their defense. Just saying that somebody has bipolar disorder or might have it is not evidence that the person is incompetent. Once the district court made that determination mid-trial at defense counsel's request that there was reasonable cause to believe the defendant might be incompetent, it was required to make a ruling on whether counsel was competent. It did that and counsel isn't challenging the district court's substantive ruling that the defendant was competent to stand trial. The court was required to conduct a hearing and it did that complied with the strictures of 4247D. And the court was not required to order that an expert submit a report. It is perhaps unusual, but also these were just unusual circumstances. There's not a competency hearing in every case. It's not raised in every case. It was raised in this case mid-trial and based on some pretty isolated statements. And then when the hearing came around on Monday morning, defense counsel said, this is the evidence we have. It's just this statement from the two doctors that evaluated him that say he's competent to stand trial. They had no other evidence to present. And one of those doctors, Dr. Hilke, was somebody that was familiar with counsel from what we understand from the record. I assume that he had been evaluating him as part of the mitigation case. And so it's not that they had no records. They had no history. One of these doctors, defense counsel says in the record, was familiar with counsel and would be able to meet with him and make that determination over the weekend. Can I ask a question about the victim impact stuff? Yes. Again, I'll start out by saying I suspect that under the very deferential standard of review and candidly when I had my law clerk go through the trial transcript and look for places where defense had specifically objected, I didn't find a lot of examples. This was a lot of victim impact testimony that strikes. I mean, I went back and compared it to Payne versus Tennessee, and we've traveled quite a journey in terms of what we're allowed in terms of victim impact. So by modern standards, what was allowed in Payne seems extremely minimal today. I guess I will just say this struck me as a lot, and I guess I'll also say the government's argument in its brief that it's okay because we went emotional witnesses, fact witnesses, emotional witnesses in some sort of responsible effort to break it up, strikes me as implausible given the words primacy and recency, which everybody who studies rhetoric knows. Would you like to comment on that at all? Your Honor, I don't think that this was for sure compared to Payne versus Tennessee. This was more victim impact evidence than you found in the case where the court was saying that it was okay when previously it had not been. But there were four family members or friends for each victim. This was a multi-victim case, and then two people from the bank that testified. This was, I mean, it's maybe slightly more than testified for each person in Dylann Roof's case, but that case had a lot more victims, and so the proceeding went on for a lot longer. And so there were just a few witnesses per victim, and the district court took steps to limit that amount of testimony. So it said 15 to 20 minutes for the bank witnesses, 30 for the family and friends. That was the property on the other side that we routinely blew well past them. Well, you know, I did read through all that testimony as well, and there's nothing that's particularly, you know, I think what you're looking for in the victim impact testimony to find some kind of an error under the Supreme Court's precedence or something where the witnesses are making a characterization or saying, I think that person should get the death penalty or, you know, things like that. None of that happened here. These people gave appropriate testimony about how the death of their family members and friends impacted them, described that person's impact on the community. I guess on the occasions that we got, on the one occasion we started talking about the impact on the local banking community, the district court said, let's not do that anymore. Yes, and I think I'll just point out under this court's cases, I don't think that was actually an error. Under Runyon and Payne, I think you can actually give evidence about what is. With respect to the counsel, with respect to the victim impact testimony, it's my recollection reading about that, that the, when the witnesses became very emotional about the impact that it was, these deaths were having on them and members of their family. I thought that the district court kind of paused things to allow the witnesses to sort of recollect themselves and so that it didn't just result in a kind of a sobbing spree, but that there were, that the witnesses recovered, the district court wanted to make sure that the district court, that the witnesses recovered their poise and that the proceeding resembled a legal proceeding and not just an emotional hand-wringing. Am I correct in that impression? Yes, that is my impression too. And I believe that that was also directed and led by the prosecutors who were putting on the witnesses. You'll see comments like at JA 4981 where a witness may have cried on the stand and then the government said, hey, we're going to switch the next witness that we want to bring in because this is getting a little emotional and we're going to go back to some fact witnesses now or bring on somebody who can talk about something else. You would agree with me that since Aristotle, people have known about primacy and recency and you'd agree with me that you began with four emotional witnesses and ended with four emotional witnesses? That's the way that it turned out. I don't know that that was the plan or orchestrated in that way to do primacy and recency. So you're not familiar with the notion that the most persuasive things are the ones you say first and the ones you say last? I mean, I won't quarrel with the concept. I think what the record points out is that the government and the court too were making an effort to make sure that this didn't get out of hand. And from my impression of the record, it didn't come close. I mean, there are due process concerns with when things get really out of hand and people are screaming and crying. This seemed to be, from my review of the record, controlled testimony and there were appropriate comments made when people did start to get emotional. So I understand. Roof says that religion is not categorically out of bounds. I guess the obvious distinction between this case and Roof is in a world where people are murdered in a church, I don't know how we can possibly not talk about church, right? I mean, I think that's a totally sensible point from the Roof case. In a world where people are murdered in church, we're going to talk about church. These were two people who were murdered in a bank. I mean, I guess does the government agree that at some point there's a limit to talking about the victim's religiosity? Well, religiosity is one thing. Talking about them being a Christian or being of a specific religion. I think the testimony that focused on religion in this case was really confined to contextualize the relationships that the people testifying had with the victims to contextualize their volunteer work and things like that. And that's exactly the type of evidence we're allowed to put under pain is what the community, what the world is losing from the loss of this unique victim. Their church was their community. These were two religious people, but the testimony was not about their religion. It was about their community and the ways that they impacted their community. Do you agree that at some point talking about the victim's religiosity would become a constitutional problem? I won't quarrel with it. I don't think it was anywhere close in this case. You could imagine, right? Yes. I mean, the statute says that 18 U.S.C. 3593 F says that you can't, you shall not consider the religious beliefs of the defendant or the victim in imposing your sentence. And the jury has to be instructed about that in every case. And they were here and signed a form saying that they were not influenced by religion. I think one of the difficulties here is that the result of this case in the final analysis, it wasn't steered in one direction or another by trial error or by the errors that the district court made in the exercise of its discretion or witness testimony. If I thought that a super emotional victim impact statement or a neglect to answer, to ask basic questions or afford counsel the right to ask basic questions dealing with possible racial bias. If I had thought that they influenced the outcome of this, that would be one thing. But I think here that defense counsel just faced a very difficult case on the facts, where there were absolutely no question of the defendant's guilt, and where two individuals that were perfectly innocent were just gunned down in cold blood. And later on, the defendant with some friend he ran into, appeared to adopt an almost celebratory attitude toward what he had done. And those facts, there wasn't an era of law that determined things here. Those facts are just very hard to overcome in terms of what was done, the callousness of what was done, the lack of any kind of genuine remorse, and in fact, quite the opposite. And so the challenge is raised with respect to the trial judge and matters on which the trial judge enjoys an extraordinarily broad range of discretion under our standard of review here. By and large, when you look at the trial as a whole and the transcript as a whole, obviously, it's an emotional situation. But this trial judge did a very competent job and a very decent job. And he granted continuances even after the government objected to them. But I just, when I look at this case, its outcome was dictated by what happened, by the callousness of what happened. I don't think it was dictated by race. I don't think it was dictated by overly emotional victim impact statements, victim impact testimony. I think it was dictated, the ultimate outcome was dictated by the sheer cruelty, the sheer cruelty of what happened to these two victims. And that's why things turned out the way they did. It's just an overall oppression that I have because I never want to be party to any case where a person is sent to capital punishment who is arguably innocent. I never want to be part of that. I don't ever want to be a part of a trial that's driven by emotion or racial prejudice or racial dog whistles. I don't ever want to be a part of that. But this is not a fact. This is something very different. It wasn't dictated by emotionalism and it wasn't dictated, I don't think, by race. It was dictated by the fact that two people were just gunned down for no reason or for the worst of reasons. That's why this turned out the way it did and the district court tried to make sure there was a fair presentation and that the defendant had a chance to ask  and, by and large, to do what he wanted to do. That's just a thought about it, but it's the thought that I'm left with after thinking about this case. I won't disagree with any of that, Judge Wilkinson. I think that is the government's view as well. This case was well tried. The judge was fair. The judge referred at various points to being extra careful, providing super-due process and a capital case to make sure we're not missing anything. I'm not sure I'd go that far. What about the, to me, very troubling decision to basically short-circuit a Batson hearing? I think they probably waived it, I think, in the face of a trial judge who very clearly wanted to keep things moving. But I guess I will say I'm troubled by the fact that there was no Batson analysis, and I'm troubled by the fact that defense counsel, to me, pretty clearly waived a Batson claim. But if I'm going to say they waived it, they waived it because a district court judge made very clear they didn't want to take even a brief recess to allow them to press a Batson claim. The judge gave the defense all the time that they asked for. Fifty-five seconds on the record. That is what the defendant said. The judge asked, was there any problem with the way this jury was selected, and both parties said no. And then after the judge kind of told the jurors that were selected to walk out of the room. The defendant was very clearly a misunderstanding from the trial judge and defense counsel. Yes, and that misunderstanding was identified. And defense counsel said, we need to figure out if we're going to make a Batson claim. The judge said, oh, that's what I was asking before, but okay, are you going to make a Batson claim? The defense counsel said, he said, am I bringing these people back in here? I mean, there was some confusion. There was no answer when the judge initially asked. It was very clear to me from the transcript that the judge did not want to recess to bring in a Batson claim because the judge had already said, I'm going to send the jurors home. I understand we're reading a cold record. I understand that. But even on this cold record, I perceive a district judge who is conveying, let's keep this moving. It's certainly incumbent on defense counsel to make the Batson claim. And they said to the judge, we just need a minute. We need to go back and look at our papers and decide if that's something that we're going to do. And the judge said, that's fine. And the defense counsel went back to their table. They came back and said, all right, we are fine. We have no objection to the selection process. I agree. And I think that's probably a waiver. Yes. And at that point, they didn't ask for any more time. I mean, the judge gave them the time they asked for. The judge was not required to sui sponte, extend the amount of time that the defense counsel would have to consider whether they wanted to make a Batson claim. And ultimately, we think the issue, as I think Your Honor insinuates, was clearly waived by defense counsel. I do have some time left. We only covered competency in the opening argument. I don't have anything else to say on that. I'm happy to sit down unless the court has any questions on any of the remaining issues. Judge Agee, do you have any further questions? No further questions. Judge Heitens, do you have further questions? I do not. All right. Thank you very much, Ms. Adams. We appreciate it. Mr. Fisher, you have some time that you've reserved for rebuttal. Thank you. We're pleased to hear from you. Thank you, Your Honor. I'd be happy to answer any questions about the other issues, but if not, I'd like to respond to a question that Judge Agee asked opposing counsel about the competency issue. And Your Honor asked about Pate. In Pate, what the court said was not a quantum of other evidence that the defendant may be incompetent. They said once you get past that post, that you sort of cross that Rubicon, at that point a requirement of process kicks in. And they said there has to be a hearing. And they talked about the kind of hearing. Clearly, by hearing, they didn't mean the handing up of a conclusory statement because the judge had that in that case. In fact, they talked about the kind of hearing they meant.  In Pate, just also to remind the court, this is a case where defense counsel never requested, there was a competency process, never invoked it and said, raised questions about the defendant's sanity at the time of the crime, but said he's lucid now. So it was a very similar case where the court emphasized the judge's sua sponte duty. And I want to connect that to the hearing requirement because, Judge Agee, you asked at the beginning, you said the statute says there has to be a hearing. And Judge Hyten said that too. There wasn't a hearing here. There was the handing up of a statement, a conclusory statement, and defense counsel endorsing it. That is not the hearing that's contemplated by the statute. The statute's hearing requirement informs what has to come before. A judge has a sua sponte duty to find reasonable cause, even when defense counsel isn't raising it. But it wouldn't make any sense to say, well, at that point the judge can say, I find reasonable cause, or we're going to go into a hearing without any evidence. The statute says the judge has to make a finding by a preponderance of the evidence. That requires evidence. This court has to have a record to review. Here this court has no evidence to review as to whether the finding of competency was supported. There is no evidence. There was a conclusory statement. The judge had to make his own decision. And opposing counsel says, well, what do you want the judge to do? Did you want him to incite adversarial proceedings since defense counsel wasn't opposing it? No. That's not what we're saying. What we're saying is the court needed to do what every other court has done in this situation, which is it has to have a full report. It has to review that report. It has to consider everything else it knows, which the court didn't do here. And then it has to exercise its discretion to ask questions, say, is there something in the report that raises doubts for me? Is there something that requires me to bring the experts in to testify? Is there something that requires another expert evaluation? Here I think the judge should have said, why are they not saying anything about the delusional breakdown? I think all those things inform the hearing requirement. The second point I'd like to make, Your Honor, about the issue of the independent expert, there is case law that says specifically in the competency context, you have to appoint an independent expert, not a partisan expert. And it's cited in our brief, the Harmon case out of the First Circuit and the Pagani case out of the Third Circuit. And the issue is not just whether it's a defense or a prosecution expert, because here the defense clearly has an agenda to avoid going to an independent expert, but kind of put a lid on the whole competency thing. It's because each party's experts are partisan. That means counsel tells them what to look at. Counsel gives them the information or withholds information. Counsel defines the scope of what they look at. And counsel defines how much they tell the court. That's the difference. And that's why those cases say an independent evaluation is required. And the last point I would like to make on competency is, I think the government grossly distorts the record in portraying what happened during this delusional breakdown as simply a matter of, oh, Mr. Counsel wanted to testify, and the defense had one of their experts, they had some questions for them to resolve. The same way I think they do with the prior indications of mental illness. The prior indications of mental illness were such that defense counsel and the district court took them as mental illness. And in the middle of trial, this wasn't just about whether the defendant was going to testify. Defense counsel filed a motion laying out how he had no rational understanding of the proceedings. They couldn't rationally communicate with him. They detailed it in the motion. They further detailed it the next day, talking about how he believed he was being persecuted because he couldn't subpoena God. And then the judge interacted with Mr. Counsel and saw it for himself. There was no suggestion anywhere that this was some malingering or normalizing it in the way the government is trying to now. Defense counsel and the court both perceived it as a sign of serious mental illness and the basis for reasonable cause. If the court has no further questions. Thank you. Thank you very much. All right. We thank you and we will take a five minute recess and then convene to hear our next two cases.
judges: J. Harvie Wilkinson III, G. Steven Agee, Toby J. Heytens